ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/9/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID NAGELBERG, individually and as TRUSTEE of the DAVID S. NAGELBERG 2003 REVOCABLE TRUST and PENSCO C/F DAVID S. NAGELBERG ROTH IRA, MATTHEW HAYDEN, MITCHELL KNAPP, LAWRENCE J. SHEER DDS PSP, WILLIAM J. ROUHANA, JR., AMY NEWMARK, TIMOTHY ROUHANA, ROSEMARY ROUHANA, ELLA DAMIANO, MICHAEL DAMIANO, and LONDONDERRY CAPITAL LLC,

Plaintiffs,

- against -

JOSEPH MELI, MATTHEW HARRITON, 875 HOLDINGS, LLC, ADVANCE ENTERTAINMENT, LLC, ADVANCE ENTERTAINMENT II, LLC, 127 HOLDINGS LLC, and TRIPOINT GLOBAL EQUITIES, LLC,

Defendants.

17 Civ. 2524 (LLS)

OPINION & ORDER

Defendant Matthew Harriton moves for summary judgment seeking to dismiss plaintiffs' claims against him for securities fraud and common-law fraud on the sole basis that plaintiff is unable to present any evidence that defendant Harriton acted with the requisite scienter. He also moves for summary judgment on plaintiffs' breach of contract claim.

Defendant's motion is denied in part and granted in part.

**DISCUSSION**

As a preliminary matter, plaintiffs state in their Opposition Brief (Dkt. No. 158) that they are "not pursuing breach-of-contract claims against Matthew Harriton individually." Opp'n. Br. at 12. Given plaintiffs' decision to

-1-

abandon that claim against defendant Harriton, the Court grants defendant's motion for summary judgment on that issue and dismisses plaintiffs' claim against Mr. Harriton in his individual capacity for breach of contract.

Turning to the claims of securities fraud and common-law fraud, to defeat summary judgment on the basis of scienter "a plaintiff must either (a) allege facts to show that defendants had both motive and opportunity to commit fraud or (b) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999)(internal citations and quotation marks omitted); see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 888 F.Supp.2d 431, 444-45 (S.D.N.Y. Aug. 17, 2012)("[P]laintiffs need only offer evidence from which a jury could *infer* scienter – indeed, it is the rare defendant who **admits** to having had fraudulent intent.")(emphasis in original).

The Second Circuit has described recklessness as:

> [A]t the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. . . . An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.

Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir.1996)(alterations in original).

"The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous

-2-

inferences." Press, 166 F.3d at 538. "Whether a given intent existed is generally a question of fact," appropriate for resolution by the trier of fact. Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir.1998).

Here, plaintiffs have offered evidence from a which a jury could infer Harriton's conscious misbehavior or recklessness, and while many of the general facts are undisputed, their significance and persuasive effect will strongly depend on the jury's evaluation of Harriton's credibility.

According to plaintiffs, defendant Harriton and his co-defendant Joseph Meli worked together to create and operate various investment entities through which they purported to pool investor money into a high-end ticket-resale business for popular Broadway shows and concert tours, including Hamilton and Adele. The business was a Ponzi scheme, and the money pooled from investors was not used to acquire an interest in ticket blocks or to sell the tickets for a profit on the secondary market, but instead used to repay other investors and further the personal interests of the defendants.

It is undisputed that two of the entities, 875 Holdings and AE II, pooled the funds from investors and then purported to enter into agreements to acquire an interest in ticket blocks which were purportedly owned by Advance Entertainment, a third, previously existing company owned by defendant Meli. 875 Holdings and AE II were formed and managed by both Harriton and Meli. Defendant Harriton owned an 80 percent interest in 875 and

-3-

a 20 percent interest in AE II. Harriton, whose professional background is in finance and start-ups, was responsible for the accounting and day-to-day management of the entities. See Df. R. 56.1 Statement at ¶ 17; Harriton Decl. at ¶ 5. He was a signor on their bank accounts, and oversaw investor communications and distributions. He was the source of information to investors such as plaintiff Nagelberg, who testified at his deposition:

> I asked many questions of Matt Harriton -- you know, I -- you know, and I did my -- you know, due diligence of -- you know, checking out in the industry. If it made sense, I tried -- you know, I did as much, spoke to as many individuals as I possibly can. But a lot of conversations were verbal, were verbal conversations with Matt Harriton who ended up being -- who I was told by Joe Meli -- was my primary contact person for me -- is going to be Matt Harriton. He's the person I should deal with, the questions, et cetera, his partner, Matt Harriton. So I did. I had numerous conversations with Matt Harriton asking many, many questions and documents were provided. I received the -- I had the Tripoint documents, I had the Hamilton agreement and I went over the same thing with Matt Harriton of why it seemed almost too good to be true. And I received assurances that it's just a great opportunity and obviously I was lied to.

Hogan Decl. Ex. J at 111:19-112:9. Harriton did not have access to the books and records of Advance Entertainment or those of its subsidiary 127 Holdings, another entity controlled by Mr. Meli that was in existence prior to the investment scheme at issue here.

According to plaintiffs, Harriton furthered the ticket scheme by personally telling investors that Advance Entertainment had purchased blocks of tickets to several events and that Harriton would use investors' money to buy the tickets from Advance Entertainment and resell them for a profit on the secondary market (profits which would then be shared with

-4-

plaintiffs). It is undisputed that he showed investors, including plaintiffs, a 2015 letter agreement between Advance Entertainment and Jeffrey Seller, a Hamilton producer, "pursuant to which Advance acquired 35,000 premium tickets to the Broadway musical 'Hamilton'" for $7,000,000. See Burnett Decl. Ex. I.; Hogan Decl. Ex. M at 104:16-22. He also presented investors with a 2016 letter agreement between AE and September Management, Ltd. "pursuant to which [Advance Entertainment] may acquire up to FIFTEEN MILLION DOLLARS of premium tickets to the upcoming North American performances of Ms. Adele Laurie Blue Akins, the musical artist popularly known as 'Adele,' scheduled for the calendar year 2016". See Burnett Decl. Ex. M; see Hogan Decl. at Ex. K at 128:23-129:9; id. at Ex. M at 104:16-22. In reality, the agreements were forged, and neither Advance Entertainment nor any of the other entities had any agreements with the producers to purchase any such tickets.

It is also undisputed that Harriton was shown the executed ticket purchase agreements by defendant Meli, but he never independently confirmed the agreements or verified whether the tickets in fact existed and belonged to Advance Entertainment. He never saw the bank statements showing money going from Advance Entertainment and 127 Holdings to the third parties such as Hamilton and Adele, and never questioned defendant Meli's refusal to produce the account information or tax returns to inquiring investors. See Hogan Decl. Ex. I at 58:10-59:8; 145:11-12; 160:24-161:3; 186:20-189:25. Since he did not have

access to those physical documents, Harriton obtained the financial information orally or by email or text from Meli and used that information to complete Excel spreadsheets that he would supply to investors, without verifying any of the data. See id. at 195:12-14; 201:3-24; 202:23-203:3; see also id. at 169:18-22; see also id. at 115:21-25.

Harriton did repeatedly ask Meli to connect him directly with producers and managers forming the basis of the investment, but Meli refused, so Harriton never spoke with them.[1] See Hogan Decl. Ex. I at 35:17-12; 129:13-130:9. And although Harriton asserts that he believed Advance Entertainment had purchased the blocks of tickets as promised, it is undisputed that he bought investors tickets to the same concerts through third parties like Ticketmaster, rather than through Advance Entertainment's ticket blocks, using funds from the entities and paying inflated fees for those tickets.[2] Id. at 123:21-128:2-12.

It is also undisputed that Harriton conveyed to plaintiffs that there was no management fee payable to the managers of 875. See Hogan Decl. Ex. R ("there is no management fee"); id. Ex. S. ("There are no management fees or salaries. . . ."). However, Harriton was paid approximately $1,200,000 over the relevant

---

[1] Harriton states his desire to speak with those managers and producers was for security in case something happened to Meli, not, as plaintiffs argue, because he doubted or wanted to verify the existence of the tickets. See Hogan Decl. Ex. I at 35:17-12; 129:13-130:9.

[2] Harriton testified that the funds came from 875's management fee, not the investor fee, and explained that while it would've been cheaper to use tickets purchased through Advance Entertainment, he chose not to because it would've cost investors their profit. See Hogan Decl. Ex. I at 123:21-128:2-12.

-6-

period, and the parties dispute whether this was in the form of a management fee or money that Meli owed him for previous work that was rolled into the investment program.

Harriton argues that a jury could not properly infer scienter from the above detailed facts and that he had no role in, and was completely unaware of, any fraudulent activities occurring through the companies. He states that it is undisputed that his co-defendant Meli was a skilled fraudster responsible for orchestrating the entire scheme and that the scheme was completely powered by defendant Meli's purported personal relationships with promoters, managers, talent and secondary ticket brokers. He states that he was not involved in any way with the purchases of tickets or arrangement for the resale of the tickets on the secondary market, and that there is no evidence that he knew that the purchase agreements were falsified or that investor money was being misappropriated. According to Harriton, he believed the tickets were actually being purchased for the alleged investment program and resold on the secondary market for profit.

In support of that belief, he states that many sophisticated investors saw the same purchase agreements and still invested with the companies since they raised no red flags. In addition, the books and records of 875 Holdings and AE II allegedly showed investor funds being transferred to the Meli companies and purported returns coming back. See Hogan Decl. Ex. I at 131:24-132:23. He testified that Meli showed him cash he

collected from ticket brokers for the resale of the tickets, and that he didn't find it odd that the deals were done in cash, rather than through wire transfer. See id. at 133:23-134:3-19. Significantly, Harriton points to the fact that his own family and friends contributed to the investment program and lost money as evidence of his good faith belief in the investment program.

This leaves the issues as follows:

Plaintiffs have no direct evidence that Mr. Harriton had "scienter", the guilty knowledge of the fraud necessary to hold him liable. Harriton maintains, and points to circumstances consistent with reasonable ignorance of what Meli was actually doing, and on that basis, seeks dismissal of the claims as a matter of law.

But contrary to Harriton's arguments, a jury may draw inferences from the factual evidence of his relationships with Meli, the corporations (of which he was an owner and manager), and the transactions which he touted to investors, that it is more likely than not that he had scienter, the knowledge of what was going on.

That is a question for the jury, and juries are particularly skillful in determining such matters of interest, motive, and the like. See Litton Indus. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 751 (2d Cir.1992)("Resolution of the question of scienter, as with any issue of motive or intent, generally requires examination of a witness's demeanor and credibility and is thus usually inappropriate for disposition on

-8-

summary judgment.").

## CONCLUSION

Defendant Harriton's motion for summary judgment is denied in part and granted in part. The breach of contract claim against him in his individual capacity is dismissed, and summary judgment in his favor on the remaining fraud claims is denied.

So Ordered.

Dated:   New York, New York
         June 9, 2022

*Louis L. Stanton*
LOUIS L. STANTON
U.S.D.J.